# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1003 | **DATE** | 9/28/2001 |
| **CASE TITLE** | Lawrence L. Pickett vs. Ingalls Hospital | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (Doc. No. 28-1) is granted. Judgment is entered in favor of Defendant Ingalls Hospital and against Plaintiff Lawrence L. Pickett. Its motion to strike (Doc. No. 44-1) is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 3 | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | 45 |
| | Notified counsel by telephone. | SEP 28 2001 | |
| | Docketing to mail notices. | date docketed | |
| ✓ | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | 9/28/2001 | |
| | courtroom | date mailed notice | |
| ETV | deputy's initials | | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials |

**DOCKETED**
SEP 28 2001

LAWRENCE L. PICKETT,           )
                              )
          Plaintiff,          )
                              )
     v.                       )          No. 00 C 1003
                              )
INGALLS MEMORIAL HOSPITAL,    )          Judge Rebecca R. Pallmeyer
                              )
          Defendant.          )

## MEMORANDUM OPINION AND ORDER

Until June 28, 1999, Plaintiff Lawrence Pickett was employed by Defendant Ingalls Memorial Hospital ("Ingalls" or "the Hospital") in a position in which he assisted patients and their families in understanding hospital policies. After his termination as part of a reduction in force, Pickett, an African-American, filed a charge of discrimination with the EEOC, alleging that his termination was a product of race discrimination and retaliation. Pickett later amended the charge to include an allegation that the discharge was also motivated by his disability, an anxiety disorder apparently diagnosed only six days before his discharge. Defendant Ingalls has moved for summary judgment, and for the reasons set forth here, the motion is granted.

## FACTS

Lawrence Pickett, an African-American male, attended college for 2-1/2 years at Roosevelt University and Chicago State University, studying public administration, psychology, and business. (Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Facts (hereinafter, "Pl.'s 56.1 Add'l. Facts") ¶¶ 2, 3.) In November 1990, Pickett was hired by Ingalls for the position of Senior Patient Representative, reporting to Nancy

45

McNelis, the Director of Patient Representatives. (Defendant's Local Rule 56.1 Statement of Material Facts (hereinafter, "Def.'s 56.1 Stmt.") ¶ 4.) Ingalls is a 582-bed acute care community hospital which employs 2,300 persons and is the largest employer in the community of Harvey, Illinois. (*Id.* ¶ 3.)[1]

In his role as Senior Patient Representative, Pickett was responsible to assist patients and their families with inquiries regarding hospital policies, procedures, and services. (*Id.* ¶ 5.) In addition, Pickett was expected to assist emergency room and critical care staff in learning about patients' perceptions of their experiences in the hospital. (*Id.*) The parties disagree about whether Pickett had supervisory responsibilities and whether his position was part of Ingalls' administration. (*Id.* ¶ 5.) According to Kurt Johnson, who was at the relevant time a supervisor and is now Ingalls' CEO, "[i]n Larry's role, as I understood it as patient representative, he would not have been part of administration, per se." (Johnson Dep., Ex. G to Defendants' Supplemental Appendix, at 15.) Pickett believes his position was in fact an administrative position, that he was the only African American male in such a position

---

[1]     Pickett believes Ingalls hired him to address Ingalls' image in the community of engaging in racism in its hiring and promotion. (Pl.'s 56.1 Add'l Facts ¶ 10.) He asserts specifically that when hired, he was advised that he would be working in the Emergency Room to help eliminate Ingalls' racist image in the community. Pickett has not identified the individual who advised him of this, however, and in support of this assertion he cites only pages 172-174 of his own deposition; copies of those pages do not appear in the appendix to his Statement of Facts. Ingalls argues that Plaintiff has no non-hearsay evidence to support these assertions and moves to strike them. Although the court declines to address each of the argument Ingalls has made in its motion to strike (Doc. No. 44-1), the court recognizes that an assertion unsupported by admissible evidence is not sufficient to create a dispute of material fact.

at the time of his hire, and that only one other African-American has worked in administration at Ingalls in its 80-year history. (Pl.'s 56.1 Add'l Facts ¶ 11, 12.) Ingalls denies that Pickett was part of the Hospital's administration (Def.'s Motion to Strike, at 28), but does not deny his contention that there were no other African-Americans employed as administrators.

During Pickett's tenure as a Senior Patient Representative, his supervisor, Nancy McNelis, assumed the role of Care Center Specialist but continued to maintain her position as Director of the Department of Patient Representatives, as well. (Plaintiff's Rule 56.1 Statement (hereinafter, "Pl.'s 56.1 Stmt.") ¶ 11.) Pickett testified that he believes he was not considered for promotion to the Director position due to his race (Pickett Dep., Ex. A to Defendant's Appendix, at 149-153), but stated in his submissions to the court that he "does not feel he should have been promoted" to the Director position because "he did not know the post was open." (Pl.'s 56.1 Stmt. ¶ 11.) Pickett did not apply for the position and does not know whether anyone else was hired for or promoted to it. (*Id.* at 157-160.)

In December 1997, Pickett's position of Senior Patient Representative was eliminated as part of a financial cutback and organizational redesign, and Pickett was moved to the newly-created position of Emergency Department Customer Service Representative, at the same salary. (Def.'s 56.1 Stmt. ¶ 7.)[2] Pickett asserts, and Ingalls does not deny, that Pickett was advised that the move was temporary (Pl.'s 56.1

---

[2] Neither party has explained whether other persons were affected by this position elimination, or who was involved in the decision.

Add'l Facts ¶ 25; Def.'s Motion to Strike, at 33); neither party states who told him this, nor does either party explain what was expected at the end of the temporary reassignment.[3] Pickett characterizes this job change as a demotion (Pl.'s 56.1 Add'l Facts ¶ 18) which confined him to the Emergency Room and stripped him of responsibility for any patient or family complaints other than those relating to waiting times or visitation. (Pl.'s 56.1 Stmt. ¶ 8.) According to Ingalls, the job change was not a demotion, and Pickett's basic function remained nearly the same as it had been in his previous assignment. (Def.'s 56.1 Stmt. ¶ 8.)

Pickett believed at the time of the job change in 1997 that the change was motivated by his race and was intended to position him for a layoff. (Def.'s 56.1 Stmt. ¶ 10 citing Pickett Dep. at 62-64: "Q. And you felt in '97 that it was because of your race, correct? A. Yes.") He asserts, in addition, that the job change was Ingalls' response to reports Pickett had made to his then-supervisor, Beverly Klinkhammer, during 1996 and 1997, concerning what he believed to be racially-motivated triage practices at the Hospital. (Pl.'s Add'l Facts ¶ 32.) According to Pickett, after he expressed his concerns regarding these practices, he began receiving unexcused

---

[3]     Pickett asserts the Department of Patient Representatives was never formally dissolved (Pl.'s 56.1 Add'l Facts ¶ 25), but cites only Kurt Johnson's testimony that he did not recall whether the department was dissolved. Ingalls, for its part, does not explain whether the Senior Patient Representative's responsibilities were reassigned to anyone. Pickett claims Rita Sears and Lynn Juricich were moved to the Emergency Department to perform tasks that Pickett had previously been responsible for (Pl.'s 56.1 Stmt. ¶ 7). Ingalls characterizes this assertion as speculative, but offers no information concerning Sears' or Juricich's position and responsibilities. (Def.'s Motion to Strike, at 6.)

absence reports, culminating in a "Corrective Action" notice dated May 26, 1999, which warned that further absences could result in termination. (*Id.* ¶ 33; citing Ex. 14, 5/26/99 Corrective Action Notice.) Ingalls acknowledges that Pickett received unexcused absence notices, but denies they were related in any fashion to his concerns regarding Ingalls' triage practices. (Def.'s Motion to Strike, at 36.)

In late 1998 and continuing in early 1999, Ingalls was experiencing operating losses of approximately $1,000,000 per month. (Def.'s 56. 1 Stmt. ¶ 13.) In response to these losses, in the spring of 1999 Ingalls began to implement a hospital-wide reduction in force and to reduce the hours of existing staff. (*Id.* ¶ 14.) Ingalls terminated five employees who were not assigned to an alternative position, including Plaintiff; of these, only Plaintiff is African-American. (*Id.* ¶ 29.) Pickett asserts that his termination was not part of a reduction in force, but the only evidence he cites is the fact that when Chris Hargreaves interviewed for his position as Head of Human Resources in April 1999, nobody he spoke to discussed plans for an organization-wide layoff. (Pl.'s 56.1 Add'l Facts ¶ 35.)

By June 1, 1999, Ingalls had decided to eliminate the position of ED Customer Representative as of July 1. (Def.'s 56.1 Stmt. ¶ 16.) (Other than Hargreaves, Ingalls does not identify the person(s) involved in making this decision.) Four persons held the position in 1999: Dawn Williams, an African American female; Clara Ruffalo and Jan McAfee, both white females; and Pickett. (*Id.*) Williams resigned on April 19, 1999; her position was not filled. (*Id.*) Ruffalo and Pickett were formally notified of their

layoffs on June 28, 1999, and McAfee was notified on July 1, 1999. (*Id.* ¶ 18.) Chris Hargreaves, Director of Human Resources at Ingalls, acknowledged that Ruffalo knew prior to June 28 that she would be taking another position at Ingalls, and that it is "likely" that someone had spoken to both McAfee and Ruffalo prior to their termination meetings. (Hargreaves Dep., Ex. 4 to Pl.'s 56.1 Stmt., at 67-68.) Ruffalo, McAfee, and Pickett were all offered severance packages (Def.'s 56.1 Stmt. ¶ 21-22), but Ruffalo and McAfee bid on and were hired for open positions at Ingalls, in capacities similar to their jobs prior to becoming ED Customer Representatives. Ruffalo, who had previous worked for Ingalls as a Clinical Associate, successfully bid on an open Clinical Associate position. (Def.'s 56.1 Stmt. ¶ 19.) McAfee, who had previously worked as a Patient/Billing Representative, successfully bid on a similar position with MedCentrix, an Ingalls affiliate, at a lower rate of pay than she had earned as an ED Customer Representative. (*Id.* ¶ 20.)

On June 28, 1999, Beverly Klinkhammer, who was the Emergency Room Director and Picketts' immediate supervisor, and Chris Hargreaves met with Pickett and advised him of the lay-off. (*Id.* ¶ 8, 15, 22.) Klinkhammer and Hargreaves explained the reasons for the layoff, described Ingalls' outplacement process, advised Pickett that he was eligible for continued health care benefits, and presented a calculation of Pickett's final compensation. In addition, Klinkhammer and Hargreaves explained that Pickett was eligible for recall in a position for which he was qualified within the next 12 months. (*Id.* ¶ 22.) Pickett denies being told he was eligible for recall (Pl.'s 56.1 Stmt. ¶ 22), but at the meeting he signed a "Staff Reduction Interview

6

Checklist," which reviewed the information discussed at the meeting, and specifically included information concerning eligibility for recall and the Hospital's outplacement process. (Def.'s 56.1 Stmt. ¶ 23, Staff Reduction Interview Checklist, Pickett Dep. Ex. 10, Ex. B to Def.'s 56.1 Stmt.)

Prior to the meeting, Hargreaves had reviewed Pickett's work history with Klinkhammer. (Hargreaves Dep., Ex. 4 to Pl.'s 56.1 Stmt., at 29.) Because both of the positions in which Pickett had worked previously had been eliminated, Hargreaves was unable to identify a position for which Pickett was qualified, but he gave Pickett his business card and suggested that Pickett contact him personally to discuss any positions for which Pickett felt he was qualified. (Def.'s 56.1 Stmt. ¶ 24, 25.) Hargreaves explained that he invited Pickett to contact him personally because Ingalls receives 100 job applications every day, and without a personal contact, Pickett might be overlooked. (Id. ¶ 25.) Hargreaves showed Pickett a list of current job openings and asked Pickett what positions he felt he was qualified for, but Pickett expressed no interest in any of the open positions. (Id.) Nor did Pickett ever contact Hargreaves at any time after the meeting to discuss available jobs. (Id. ¶ 26; Pickett Dep., Ex. 2 to Pl.'s 56.1 Stmt., at 216-17.)

Pickett acknowledges that Hargreaves' business card was included with materials in his termination packet, but denies that Hargreaves discussed any other positions or offered any assistance to him in finding another job at Ingalls. (Pl.'s 56.1 Stmt. ¶ 25; Pl.'s Add'l. Facts ¶ 72.) Pickett did not look at the list of open positions until weeks later. He believes he was qualified for at least one position in the

transportation department, but there is no evidence that he applied for it, and Pickett has not rebutted Ingalls' assertion that Pickett he has never contacted Hargreaves "to inquire about, bid on or discuss any open positions." (Pl.'s 56.1 Stmt. ¶ 26.) Pickett's only effort to be re-hired by Ingalls occurred in December 1999, when he applied for any open position, including housekeeping or transportation. (Def.'s 56.1 Stmt. ¶ 28.) In response, Pickett received a postcard stating that Ingalls had received the application and would review his qualifications. (Ex. 21 to Pl.'s 56.1 Stmt.) Pickett was not offered a position, however.

In addition to his race discrimination claim, Plaintiff claims Ingalls discriminated against him on the basis of a mental disability, characterized by his psychiatrist, Dr. Stephen, as "anxiety depression." (Pl.'s 56.1 Add'l. Facts ¶¶ 107, 110.) Pickett believes the ED Customer Service Representative job caused his condition (Def.'s 56.1 Stmt. ¶ 33), which resulted from the "humiliation and degradation that I had to live with because I could not afford to quit my job, but which required that I support a system and people that were totally insensitive, callous and racially biased in the treatment of the black patient population." (Pickett Affidavit, Ex. 1 to Pl.'s 56. 1 Stmt. ¶ 15.) According to Pickett, he experienced depression because of his "inability to derive any satisfaction" from working, beginning in September or November of 1998. (Def.'s 56.1 Stmt. ¶¶ 31, 33, Pickett Dep., Ex. A to Def.'s 56.1 Stmt., at 181.) Pickett first consulted a physician regarding this condition in February 1999 and continued seeing him until April or May 2000. (Pl.'s 56.1 Add'l Facts ¶¶ 89-90.) He also saw a psychiatrist beginning in May 1999 and continuing until April or May 2000. (*Id.* ¶ 90.)

The condition had subsided by November 2000. (Def.'s 56.1 Stmt. ¶ 31, citing Pickett Dep., at 182.)

Pickett asserts that his disability left him in an "almost catatonic state" and "negatively affected his desire to shower" or wash his face. (Pl.'s 56.1 Add'l Facts ¶¶ 95, 99.) Ingalls notes that Pickett never came to work in an unkempt manner, however, (Def.'s Motion to Strike, at 59, citing Pickett Dep. at 187-88), and that despite the alleged disability, Pickett continued to perform his duties as a Customer Service Representative. (Def.'s 56.1 Stmt. ¶¶ 34,35.) Asked whether he felt his condition interfered with his ability to perform his job, Pickett himself stated, "I don't think that it interfered with my ability to perform my job, no." (Id. ¶ 34, citing Pickett Dep. at 182-183.) In fact, Plaintiff felt "that [his] performance in [his] job throughout [his] employment with Ingalls was exceptional." (Id. at 189.)

On February 10, 1000, Pickett provided Ingalls with a "disability certificate" from his physician, Dr. La Verne Currie, excusing him from work between February 3 and February 9, 1999. (Def.'s 56.1 Stmt. ¶ 41.) Pickett later gave Ingalls a second "disability certificate" from another physician, Dr. Frank Bearden. This certificate excused Pickett's absence from work from June 3 to June 17, 1999 and cleared him to return to work on June 18, 1999. (Id. ¶ 42.) Neither certificate mentioned Pickett's mental disability as the reason for his absence from work. Instead, the certificate from Dr. Currie stated that Pickett was incapacitated due to the flu (Ex. 14 to Pl.'s 56.1 Stmt.), while Dr. Bearden's note offered no reason, physical or mental, for Pickett's inability to work in June. (Ex. 16 to Pl.'s 56.1 Stmt.)

9

Pickett came to work as scheduled on June 19, 1999 and was not scheduled to work again until June 22, 1999. (Def.'s 56.1 Stmt. ¶ 43.) On June 22, 1999, Pickett called in sick. (*Id.*) His psychiatrist, Dr. Stephen, gave Pickett a medical release, dated June 22, stating that Pickett was "receiving treatment for anxiety depression" and would be unable to work beginning on June 22. Pickett brought this release to the Hospital on June 23; this was the only official notification Pickett provided of his disability, but he testified that in April or May 1999, he told Tom Herzog, then-COO of Ingalls, "what I was experiencing, how I was feeling, and what was going on in my job and life." (Pickett Dep., Ex. F to Def.'s Supplemental Appendix, at 190.) According to Pickett, Herzog suggested he see a psychiatrist. In May, Pickett told Herzog that he was spitting up blood and experiencing dizziness. (*Id.* at 207.) Pickett acknowledges that he never requested an accommodation for his condition, as he was unaware he had the right to do so. (Pl.'s 56.1 Stmt. ¶ 48.) As noted, Pickett acknowledges, further, that his alleged disability did not interfere with his ability to perform his job. (*Id.* ¶ 34.)

## DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Flores v. Preferred Tech. Group*, 182 F.3d 512, 514 (7th Cir.1999). The initial burden of demonstrating the

absence of a genuine issue of material fact falls to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmovant, however, must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must produce "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Carter v. American Oil Co.*, 139 F.3d 1158, 1161 (7th Cir. 1998). In a case where, as here, the nonmoving party bears the burden of proof, he must offer sufficient evidence to establish each element of his case and may not rest on the pleadings alone to defeat summary judgment. *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 395 (7th Cir. 1999).

In this case, Plaintiff has alleged discrimination on the basis of his race and disability.[4] The Hospital has argued that some of Plaintiff's claims are time-barred, and he is unable to meet his burden of proving his remaining claims. The court addresses these arguments in turn.

## A.    Race Discrimination

In his amended complaint, Plaintiff has alleged that the Hospital discriminated on the basis of his race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. Title VII prohibits an employer from discriminating

---

[4]    In his charge of discrimination, Pickett also alleged that Ingalls retaliated against him for his expression of concern regarding the Hospital's triaging practices. Pickett's memorandum makes no mention of a retaliation claim in his response to Ingalls' motion for summary judgment, however, and the court deems it abandoned.

11

against an individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." Section 1981 prohibits discrimination on the basis of race in the making and enforcement of contracts. 42 U.S.C. § 1981 (a). Plaintiff alleges he was demoted, denied a promotion, and ultimately terminated because of his race.

## 1. Time-Barred Claims

Ingalls argues, first, that Pickett's claims relating to his alleged demotion, and the Hospital's failure to promote him are time-barred. (Defendant's Memorandum of Law in Support of its Motion for Summary Judgment (hereinafter, "Def.'s Memo"), at 6-7.) Pickett was transferred from his position as Senior Patient Representative to ED Customer Representative, a transfer he characterizes as a demotion, in April 1997. (Def.'s 56.1 Stmt. ¶¶ 9, 10.) The alleged failure to promote him to the position of Director of Patient Representatives occurred in late 1997. (*Id.* ¶¶ 11, 12.) Title VII requires a plaintiff to file a charge of discrimination with the EEOC within 300 days of the occurrence of the event that forms the basis of the complaint. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). Failure to do so bars litigation on such claims. *Speer v. Rand McNally & Co.*, 123 F.3d 658, 662 (7th Cir. 1997). The statute of limitations for a claim under Section 1981 is two years. *Booker v. Ward*, 94 F.3d 1052, 1056 (7th Cir. 1996). Ingalls argues that because Pickett filed his charges with the EEOC on August 31, 1999 and filed his complaint on February 18, 2000, his claims of race discrimination in his alleged demotion and the failure to

promote him are untimely. (Def.'s Memo, at 7.)

Pickett attempts to avoid this defense by arguing that the demotion and failure to promote him are "continuing violations," linked to subsequent acts of discrimination (his poor performance reviews and ultimate termination) that occurred within the limitations period. (Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment (hereinafter, "Pl.'s Memo"), at 22.) Under the "continuing violations" doctrine, a plaintiff may satisfy a time limitation by linking one or more otherwise time-barred act to a discriminatory act that occurred within the limitations period. "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Dasgupta v. University of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir.1997). The Seventh Circuit has

> recognized three types of continuing violations: where the exact day of the violation is difficult to pinpoint because the employer's decisionmaking process takes place over a period of time; where the employer has a systematic, openly espoused policy alleged to be discriminatory; and where the employer's discriminatory conduct is so covert that its discriminatory character is not immediately apparent.

*Place v. Abbott Laboratories*, 215 F.3d 803, 808 (7th Cir. 2000), citing *Selan v. Kiley*, 969 F.2d 560, 565 (7th Cir. 1992); *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 281-82 (7th Cir.1993).

The first of these types of continuing violation involves a fact pattern, usually related to hiring and promotions, where the employer's decision-making process takes

place over a period of time, making it difficult to determine the actual date that the allegedly discriminatory act occurred. *Freeman v. Madison Metropolitan School District*, 231 F.3d 374, 381 (7th Cir. 2000), citing *Jones v. Merchants Nat. Bank and Trust* Co., 42 F.3d 1054, 1058 (7th Cir. 1994). In such instances, the statute of limitations does not begin to run until the date that the plaintiff knows the allegedly discriminatory decision has been made.

This fact pattern is not presented here. Whether his job transfer was a demotion or not, it was "a single, significant event, not a continuing act." *Place*, 215 F.3d at 808, citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997). In *Place*, the Court of Appeals concluded that plaintiff should have known of the wrongful nature of her job transfer at the time it happened. Here, Plaintiff Pickett has testified that he believed at the time of the job transfer that the decision was motivated by his race. (Pickett Dep., Ex. A to Defendant's Appendix, at 62-64.) Under these circumstances, the time for filing his charge and for filing this complaint began running at the time Plaintiff learned about the transfer.

A second scenario for application of the "continuing violations" doctrine involves circumstances in which the employer has an express, openly espoused policy of personnel management that the plaintiff alleges is discriminatory – for example, an openly discriminatory promotional policy. *See Selan*, 969 F.2d at 565; *Price*, 215 F.3d at 807. Such a situation ordinarily does not involve a one-time act of demoting or transferring an employee, but instead involves an openly acknowledged policy of

refusing to promote or transfer members of a protected group, and evidence that the policy applied to plaintiff within the statutory time frame. *Cf. Torres v. Wisconsin Dep't of Health and Social Services,* 838 F.2d 944, 948 n. 3 (7th Cir 1988). Plaintiff Pickett offers no evidence of such a policy. To the contrary, he asserts (without any evidentiary support) that the Hospital hired him in the first place to address a perception that it engaged in racist hiring practices. Pickett notes that in its 80-year history serving a predominantly African-American community, Ingalls has only two black male administrators; this regrettable fact does not constitute evidence that Ingalls had an express and open policy of refusing to hire or promote black males. *Cf. Jones,* 42 F.3d at 1058 (second fact pattern for application of "continuing violations" doctrine "also does not apply to Jones' case because nowhere does she allege that MNB had an explicit, clearly conveyed policy of discriminating against blacks in promotion decisions.").

Finally, a plaintiff may seek to invoke the "continuing violations" doctrine in circumstances in which the employer's practice of discrimination is covert, and is "evidenced only by a series of discrete, allegedly discriminatory, acts." *Selan,* 969 F.2d at 565 (7th Cir.1992), citing *Stewart v. CPC International, Inc.,* 679 F.2d 117, 121 (7th Cir. 1982). In order for the third theory to apply, the plaintiff must be able to demonstrate that "it would have been unreasonable to require the plaintiff to sue on each [discriminatory act]" because the plaintiff "had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern

of discriminatory treatment." *Selan*, 969 F.2d at 565-66. In other words, the allegedly discriminatory incidents must be of such a nature or be carried out in such a way that the plaintiff would not be on notice that his Title VII rights had been violated. Pickett argues here that his job change and the failure to promote him may be linked under this theory to the ultimate decision to discharge him.[5] Again, Pickett's own testimony defeats application of this variation of the "continuing violation" theory. He testified that as early at 1997, he believed he was being positioned for layoff when Ingalls moved him from the position of Senior Patient Representative to that of ED Customer Representative. It would not have been unreasonable to expect Pickett to bring a lawsuit challenging this allegedly discriminatory/ retaliatory demotion at the time it took place.

Pickett suggests he was not immediately aware that the Hospital had decided not to promote him to the position of Director of the Patient Representative Department after Nancy McNelis assumed additional responsibilities. The court need not explore the issue of when Pickett knew or should have known of this decision, however, because it concludes Pickett cannot establish a prima facie case that this failure to promote him was discriminatory. In order to do so, Pickett would need to demonstrate that (1) he is a member of a protected class; (2) he applied for, and was qualified for an open position; (3) he was rejected; and (4) the employer filled the

---

[5]     Pickett mentions a series of poor performance reviews as another part of this overt pattern of discrimination (Pl.'s Memo, at 22), but the only poor performance review in the record was issued at the time of his termination meeting on June 29, 1999.

position with a person not in his protected class, or the position remained open. *Howard v. Lear Corp.* 234 F.3d 1002, 1005-6 (7th Cir. 2000), citing *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir.1999)  Pickett is a member of the protected group, but he acknowledges he did not apply for the Director position and that he does not know whether anyone else was hired for or promoted to it. (Pickett Dep., Ex. A to Defendant's Appendix, at 157-160.)  From the record, it appears that the Hospital never sought to fill the position after Ms. McNelis became the Care Center Specialist and that she herself continued to perform the responsibilities of both positions.  Even if Plaintiff's failure to promote claim were timely, the Hospital would be entitled to summary judgment on that claim.

## 2. Discharge Claim

Whether it is brought under section 1981 or Title VII, the analysis of a race discrimination claim is the same. *Dugan v. Ball State Univ.*, 815 F.2d 1132, 1135-36 (7th Cir. 1987).  Where, as here, there is no direct evidence of race discrimination, plaintiff may present a prima facie case of such discrimination by offering evidence that (1) he is a member of a protected class who (2) was meeting his employer's legitimate performance expectations, but (3) suffered adverse action, and (4) that similarly situated employees outside the class received more favorable treatment. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999), citing *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir. 1998).  For purposes of this motion for summary judgment, Ingalls challenges only the fourth element of the prima

facie case formulation. Thus, the court considers only whether similarly situated non-black employees were treated more favorably than Pickett. (Def.'s Memo, at 3.)[6]

Pickett claims that two white women who were laid off at the same time he was received more favorable treatment. (Pl.'s Memo at 19-20.) Specifically, he notes that the two women were advised of the reduction in force prior to their official termination meetings; Pickett was not notified of his lay-off until the meeting. (Pl.'s Add'l Facts ¶ 79, citing Hargreaves Dep., Ex. 4 to Pl.'s 56.1 Stmt., at 68; Pl's 56.1 Stmt. ¶ 16.) Further, Pickett notes that the two white women, Clare Ruffalo and Jan McAfee, were not really laid off; instead, each bid on and was awarded another position within the Hospital.

With respect to the alleged prior notice, Ingalls points out that Pickett was at work for only one shift during the 28 day period between the time that the lay-off decision was made and the time he learned of it. (Def.'s 56.1 Stmt. ¶ 42-26.) If Ruffalo and McAfee were attending work regularly during that time frame, it would not be surprising that they got wind of the bad news before Pickett did. The court concludes,

---

[6] Pickett questions the "propriety of and necessity for" the reduction in force (Pl.'s Memo, at 19), but this issue will not detain the court. Pickett emphasizes the fact that at the time of Hargreaves' April 1999 interview for the position of Director of Human Resources, he was not advised of an impending lay-off. (Pl.'s Add'l Facts ¶ 35.) Pickett finds this suspicious, but the court concludes it does not demonstrate that Ingalls did not have genuine financial concerns; Ingalls has offered evidence that it was suffering losses of $1,000,000 per month and implemented the reduction in force only after other efforts to cut costs failed. (Def.'s 56.1 Stmt. ¶ 13.) In any event, the court does not decide whether the RIF was necessary: "[W]e 'do not sit as a superpersonnel department that reexamines an entity's business decisions.'" *Jackson v. E. J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999), quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986).

however, that it need not decide whether or not there was a valid reason Ruffalo and McAfee had advance notice of their terminations, while Pickett did not. Advance notice is a courtesy that surely should be extended to all affected employees if that is possible; but Ingalls' alleged failure to provide Pickett with advance notice does not by itself constitute adverse action. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). In this court's view, advance notice to Ruffalo and McAfee is relevant only if it was the reason that they, but not Pickett, were able to secure substitute positions within the Hospital. Pickett has not suggested that anything in the record supports such a theory.

Pickett asserts that his co-workers were more favorably treated because they were immediately re-employed by the Hospital. Ingalls contends, however, that Pickett was not similarly situated to either Ruffalo or McAfee with respect to his previous work experience. (Def.'s Memo, at 4.) It is undisputed that each of these women applied for and accepted positions that they had held prior to becoming ED Customer Service Representatives. (Def.'s 56.1 Stmt. ¶¶ 19-20.) Pickett's own prior position at Ingalls had been eliminated, and he did not immediately qualify for any open positions; nor did Pickett apply to or even contact Ingalls to seek another job there for six months after his lay-off. (*Id.* at 24-25, 28)

Plaintiff believes that Ruffalo's and McAfee's more favorable treatment constitutes evidence of race discrimination, but the court concludes he has not demonstrated that these workers were similarly situated. Although Plaintiff is not

19

required to show "complete identity" between himself and the persons with whom he compares himself, he must show "substantial similarity." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). *Radue* was an age discrimination case in which plaintiff, who was laid off from his mechanical engineer position as part of a reduction in force, argued that his employer discriminated by failing to assist him to the same extent it assisted other employees in finding other job vacancies within the company. Affirming summary judgment in favor of the employer, the Seventh Circuit noted that in a reduction in force, the plaintiff must show that the employees who retained their jobs or were placed in other positions "possessed analogous attributes, experience, education, and qualifications relevant to the positions sought, . . . ." *Id.* at 618, construing *Biolchini v. General Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir.1999); *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1141 (7th Cir.1998); *Taylor v. Canteen Corp.*, 69 F.3d 773, 782 (7th Cir. 1995); *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1392 (7th Cir.1990). Pickett offers no evidence on these issues, and suggests no basis on which the court could conclude he has "attributes, experience, education and qualifications" that are analogous to those of Ruffalo and McAfee with respect to positions available at the Hospital. Nor did Pickett even seek another position at the time he was terminated.

The court concludes that there are no disputes of material fact on Plaintiff's race discrimination claims and that Ingalls is entitled to judgment on those claims as a matter of law.

## B.    Disability Claim

Plaintiff's amended complaint asserts that, in addition to his race, Ingalls' decision to discharge him was motivated by his mental health disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a). He argues, in addition, that Ingalls violated his right to a reasonable accommodation of his disability by failing to identify any open position for which he was qualified at the time he was laid off. (Pl.'s Memo, at 27-28.) *See Foster*, 168 F.3d at 1032 (recognizing two distinct theories of recovery – disparate treatment and failure to accommodate -- under the ADA). In order to prevail under either theory, Pickett must meet the threshold test of demonstrating that he suffers from a disability within the meaning of the ADA.

Ingalls argues that Pickett has not met that test. The ADA defines disability as the impairment of a major life activity. *See* 42 U.S.C. sec. 12102(2)(A); *Bragdon v. Abbott*, 524 U.S. 624, 638-39 (1998); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001). Federal regulations explain that a "major life activity" is a task such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Depression may qualify as a covered disability, *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1061 (7th Cir. 2000), but only if it substantially limits the individual's ability to perform a major life activity.

Plaintiff Pickett was diagnosed as suffering from anxiety depression only seven days before he was laid off by Ingalls. As of the time of his deposition on February 2, 2000, he felt the condition had resolved itself within the previous two months. A condition that is temporary, short in duration, not likely to recur, and has little long

term impact generally does not qualify as a disability under the ADA. *See Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir. 1997); *Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir. 1995); 29 C.F.R. § 1630(j). Pickett testified that the condition from which he suffered in June 1999 left him "catatonic" but he acknowledged that it never interfered with his ability to work. Notably, Plaintiff also testified that he would continue to suffer from a disability if he remained employed as a Customer Service Representative, but was not disabled from working in any other position. (Pickett Dep., Ex. A to Def's Appendix, at 182.) Under well-established case law, a condition that disqualifies an individual from performing only one job does not meet the definition of disability within the meaning of ADA. *See Duncan v. Wisconsin Department of Health and Family Services*, 166 F.3d 930, 935 (7th Cir. 1999); *Baulos v. Roadway Express, Inc.*, 139 F.3d 1147, 1151-52 (7th Cir. 1998); *Weiler v. Household Finance Corp.*, 101 F.3d 519, 523-24 (7th Cir. 1996).

For these reasons, the court has grave doubts that the condition from which Pickett suffered in 1999 constitutes a disability within the meaning of ADA. Even assuming that it does, Plaintiff can prevail on his ADA claim only if he can show that the alleged disability was a motivating, or substantial, factor in the decision to terminate him. *See Foster*, 168 F.3d at 1033. As Defendant emphasizes, Ingalls management made the decision to eliminate the position of ED Customer Representative at the beginning of June 1999. Pickett was not formally diagnosed as suffering from depression until June 22, 1999 (Pl.'s Add'l Facts ¶ 107), and did not

22

provide his supervisors with notice of his alleged disability until June 23, 1999, several weeks after the layoff decision had been made. Certainly Ingalls managers could not have been motivated by Pickett's disability unless they were aware of it, *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995); in this case, Pickett himself acknowledges that his work performance was unaffected.[7] Pickett suggests he informed Tom Herzog of his mental condition in April or May 1999, by describing his symptoms to Herzog (Pl.'s Add'l Facts ¶ 103, 111), but there is no basis for concluding that Herzog understood those symptoms as manifestations of a disability. Nor does the record present a basis for concluding that Herzog was involved in the discharge decision.

Finally, the court notes that Pickett was not the only employee who lost his position as ED Customer Representative on June 28; although they were able to find other positions within the hospital, Pickett's coworkers were also affected by the department elimination that resulted in his termination. Nothing in this record supports the notion that the Hospital was so motivated by his disability to get rid of Pickett that it chose to sacrifice an entire department in order to do so.

The court finds that there are no disputed issues of material fact with respect to Plaintiff's ADA claims. Ingalls' motion for summary judgment on Plaintiff's ADA claims is granted.

---

[7]    Pickett's testimony that his job performance remained outstanding defeats any suggestion that he needed some form of accommodation for his disability.

## CONCLUSION

Defendant's motion for summary judgment (Doc. No. 28-1) is granted. Its motion to strike (Doc. No. 44-1) is denied as moot.

ENTER:

Dated: September 28, 2001

REBECCA R. PALLMEYER
United States District Judge